UNITED STATES of America

v.

Moshe ZFATY, a/k/a "Moshe Zafaty" a/k/a "David Ben–Ami" a/k/a "David Levy" a/k/a "Eli Cohen", defendant.

No. 98 CR. 1367(BDP).

United States District Court, S.D. New York.

April 15, 1999.

Bart G. Van De Weghe, Asst. U.S. Atty., United States District Attorney's Office, White Plains, NY, for U.S.

Paul Davison, Federal Defender Division, Legal Aid Society, White Plains, NY, for defendant.

## MEMORANDUM DECISION AND ORDER

BARRINGTON D. PARKER, Jr.,
District Judge.

Defendant Moshe Zfaty moves to dismiss the felony information against him under the Interstate Agreement on Detainers ("IAD"), 18 U.S.C.App., 2 § 2, because of the Government's failure to bring him before this Court until a year after he requested action on the matter in June 1997. For the reasons stated below, Zfaty's motion is granted.

## BACKGROUND

On February 2, 1995, Moshe Zfaty, who was confined on state charges at the Mid–Orange Correctional Facility in Warwick, New York ("Mid–Orange"), was interviewed by an Immigration and Naturalization Service ("INS") agent. Zfaty provided the INS with an affidavit acknowledging that he had been deported from the United States to Israel in 1992, and had reentered without first obtaining permission from the Attorney General. On March 15, 1995, the Federal Government filed a criminal complaint against Zfaty, charging him with illegally reentering the United States after being deported subsequent to a felony conviction, in violation of 8 U.S.C. §§ 1326(a) and (b)(1). Magistrate Judge Mark· D. Fox issued an arrest warrant the same day.

On July 6, 1995, upon the Government's application, Magistrate Judge Fox issued a writ to the United States Marshals Service ("USMS") and Mid–Orange, where it was believed Zfaty was still being held, to produce him in federal court to be presented on the federal complaint. When service of the writ was attempted, however, the USMS learned that on May 17, 1995, Zfaty had been released from Mid–Orange to the New York state parole authorities. Prior to obtaining the writ, the USMS had not been notified that Zfaty was in state custody, and had not been requested to file a detainer against him. When the INS attempted to locate Zfaty through New York State parole authorities, it learned that shortly after his release from custody Zfaty had absconded from his parole supervision, and that a warrant for his arrest had been issued in June 1995.

In March 1996, Zfaty was arrested on New York State robbery, burglary, and grand larceny charges. In December 1996, he received a sentence of 3 ½ to 7 years' imprisonment on the burglary charges. On January 14, 1997, Zfaty was again interviewed by the INS, and provided another affidavit in which he acknowledged having illegally reentered the United States after deportation. In March 1997, the INS obtained an immigration detainer against Zfaty, who was at that time participating in a state prison drug program at Cape Vincent, New York. The detainer rendered Zfaty ineligible to participate in the drug program, and he was transferred to Gouverneur Correctional Facility. On June 5, 1997, Zfaty wrote the INS case agent, indicating his willingness to waive deportation formalities and his desire for prompt deportation to Israel.

On June 19, 1997, a copy of the March 15, 1995 arrest warrant and an INS civil deportation detainer were lodged against Zfaty at Gouverneur Correctional Facility. The following day, Zfaty, who was being considered for "presumptive work release" was notified that his work release application had been canceled due to outstanding warrants. Zfaty contends that he was not advised of his rights under the IAD, and did not receive any forms or information concerning the procedures required by the IAD. *See* IAD, 18 U.S.C.App., 2 § 2, Art. III(c) (requiring prison official to inform prisoner of right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based).

On June 27, 1997, Zfaty wrote to the "United States District Court" at "40 Foley Square," enclosing a copy of the arrest warrant and "demand[ing] to be arraigned ... as soon as possible." Zfaty also stated

that he would be representing himself, and requested that his case be transferred to the "Northern District Court" where he thought it would be easier for him "to defend and obtain a private attorney." The White Plains Branch of the United States Attorney's Office for the Southern District of New York received a copy of Zfaty's letter on July 16, 1997. Zfaty received no response to his June 27, 1997 letter.

A year later, on June 30, 1998, Zfaty again wrote to the Court, requesting prompt action on the warrant. This time, Zfaty's letter was forwarded to Magistrate Judge Fox, who sent a memorandum to the Government that attached Zfaty's June 30 letter and directed that Zfaty be produced for arraignment and assignment of counsel. Zfaty was produced on a writ on August 12, 1998. The information was filed on December 2, 1998. The Government concedes that it should have proceeded with greater alacrity between July 16, 1997, when it received Zfaty's June 27, 1997 letter, and July 22, 1998, when it received Magistrate Judge Fox's memorandum.

## DISCUSSION

Article III(a) of the IAD provides that a person who has "entered upon a term of imprisonment in a penal or correctional institution of a party State" and against whom another party State has lodged a detainer based on untried charges, can request a speedy trial in the State with the outstanding detainer. 18 U.S.C.App. 2, § 2, Art. III(a). Both the United States and the State of New York are "party States" to the IAD. *See* 18 U.S.C.App. 2, § 2, Art. II; *United States v. Paredes–Batista*, 140 F.3d 367, 372 (2d Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 143, 142 L.Ed.2d 116 (1998).

Under the IAD, the prisoner "shall be brought to trial within one hundred and eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officers' jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint." 18 U.S.C.App. 2, § 2, Art. III(a). In addition, "[t]he request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner." *Id.* The request for final disposition and the certificate must be sent by registered or certified mail, return receipt requested. *Id.*, Art. III(b). With respect to the IAD, "[t]he warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based." *Id.*, Art. III(c).

Zfaty contends that the March 15, 1995 arrest warrant constituted a detainer within the meaning of the IAD, and that it was lodged against Zfaty on June 19, 1997, when it was served on the Inmate Records Department at Gouverneur Correctional Facility. Further, Zfaty argues, and the Government does not dispute, that he was never properly informed of his rights under the IAD. While Zfaty concedes that his June 27, 1997 letter to the Court did not punctiliously comply with the IAD's procedural requirements, he argues that he substantially complied with the IAD's central requirements, and, as a result, the IAD's remedial provisions should apply. *See United States v. Reed*, 910 F.2d 621, 624 (9th Cir.1990).

Our Circuit recently determined that the IAD's procedural requirements should be construed literally. *Paredes–Batista*, 140 F.3d at 374 ("[T]he 180–day time period in

Article III(a) of the IAD does not commence until the prisoner's request for final disposition of the charges against him *has actually been delivered* to the court and the prosecuting officer of the jurisdiction that lodged the detainer against him.") (quoting *Fex v. Michigan*, 507 U.S. 43, 52, 113 S.Ct. 1085, 122 L.Ed.2d 406 (1993)) (emphasis in *Paredes–Batista*). In *Paredes–Batista*, while serving a sentence in state custody, the defendant was indicted on a federal illegal reentry charge. *Id.* at 371. He then escaped from a work-release program and was recaptured approximately five months later. *Id.* Shortly thereafter, a detainer relating to the federal indictment was served on New York State prison officials, who served a copy on defendant. *Id.* That detainer advised defendant of his right to demand a speedy trial on the federal charge, which defendant demanded in writing in July 1994 on the detainer form, by signing his alias to a preprinted paragraph that included language stating: "I [do] demand a speedy trial on these charges." *Id.* In September 1994, defendant's request was faxed from the USMS office in the Western District of New York to the USMS office in the Southern District of New York, but neither the United States Attorney's Office nor the United States District Court for the Southern District of New York apparently received defendant's request. *Id.* Defendant was released from state custody in March 1995. *Id.* He was thereafter arrested on the detainer and taken into federal custody. *Id.* At an April 1995 pretrial conference, defendant produced a copy of his July 1994 speedy trial request. *Id.* He then moved to dismiss the indictment on the grounds that he had been denied his right to a speedy trial. *Id.* Defendant's motion was denied in the district court and he appealed.

Although our Court of Appeals held that the 180–day clock did not begin to run until the defendant's demand for a speedy trial was "actually ... delivered to the [district] court and prosecuting officer," *id.* at 374 (quoting *Fex v. Michigan*, 507 U.S.

at 52, 113 S.Ct. 1085) (alterations in *Paredes–Batista* ), it expressed concern as to the Government's handling of the case, and warned that "federal prosecutors and the U.S. Marshals Service should not close their eyes to the pitfalls of continuing to rely on flawed procedures and paperwork." *Id.* at 373. The court further noted that "administrative inertia does not license the government to obscure the rights of prisoners without consequences," and stated:

> it is entirely conceivable that in the future a court might have grounds to conclude that the government's continued use of paperwork that on its face fails to properly advise prisoners of how to give effect to their speedy trial requests is evidence of a lack of good faith that might give rise to estoppel.

*Id.*

In this case, contrary to the IAD's requirements, and unlike the defendant in *Paredes–Batista*, Zfaty was never informed of his rights under the statute. The Government was required to, but did not, provide Zfaty with a copy of USM–17, a standardized form promulgated by the USMS that normally accompanies the Marshals' "Notice of Detainer" form (USM–16). The printed form would have provided Zfaty with a simple procedure for initiating an IAD request by signing the form and checking a box. As a result, considering his lack of information, Zfaty can hardly be expected to have exactingly complied with the IAD's procedural requirements.

Zfaty's June 27, 1997 letter, sent to the District Court and the United States Attorney's Office, identified the prisoner, his location, and the detainer at issue, and demanded to be arraigned as soon as possible. This letter substantively complied with the IAD's directive to "deliver to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction ... his request for a final disposition to be made of the indictment, information, or complaint." 18 U.S.C.App. 2, § 2, Art.

III(a). Thereafter, Zfaty was not brought before the court until August 30, 1998, over a year after he made his request under the IAD, and more than twice the 180 day period allowed under the statute. Given that Zfaty should have been, but was not, informed of either his rights or the procedures under the IAD, to require more of him under the circumstances of this case would eviscerate the IAD's remedial provisions. As a result of the Government's failure to comply with the IAD, the charges against Zfaty are therefore dismissed. *See United States v. Reed*, 910 F.2d 621, 624 (9th Cir.1990) ("[I]n cases where the government has failed to meet its obligations, and the prisoner has attempted, but through no fault of her own failed to comply with the technical requirements of the Act, the IAD['s] remedial provisions still apply.").

When the United States is a receiving State, as in this case, an order dismissing an indictment, information, or complaint may be with or without prejudice. 18 U.S.C.App. 2, § 9(1). In determining whether dismissal should be with prejudice, a court should consider the following factors: "[t]he seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice[.]" *Id.* Analysis of these factors leads this Court to dismiss the charges against Zfaty with prejudice.

First, Zfaty is charged with an illegal reentry after deportation. While certainly "serious," as all crimes are, an illegal reentry could not fairly be classified as among the most egregious crimes that come into federal courts.[1] Second, Zfaty was not brought before the court until 411 days after his June 27, 1997 request for prompt arraignment, a time more than double that allowed by the IAD. Third, the detainer prevented Zfaty's anticipated participation in a work release program and conse-

quently prolonged his state confinement by more than a year. Fourth, Zfaty, who is 45 years old and has lived in this country since he was 22, faces deportation at the conclusion of this proceeding.

Further, despite the IAD's requirement that a prisoner be informed of the IAD's provisions, Zfaty never learned of his rights under the IAD. And even after our Circuit's March 1998 warning in *Paredes–Batista* about "administrative inertia," Zfaty was not brought before the court until July 1998, four months after the *Paredes–Batista* decision. Moreover, the administration of justice supports dismissal with prejudice. While this Court ordinarily might not dismiss Zfaty's charges with prejudice, it must heed our Circuit's recent admonition in *Paredes–Batista* that "federal prosecutors ... should not close their eyes to the pitfalls of continuing to rely on flawed procedures and paperwork." *Id.* at 373. Taken together, the Government's failure either to inform Zfaty of the proper procedures under the IAD or to bring Zfaty before the court for over a year after it received Zfaty's June 27, 1997 letter requesting prompt arraignment, are just the "flawed procedures" against which the Court of Appeals has warned. Accordingly, the charges against Zfaty are dismissed with prejudice.

### CONCLUSION

For the foregoing reasons, Zfaty's motion to dismiss the felony information against him is granted. The Clerk of the Court is directed to dismiss the felony information with prejudice.

### SO ORDERED:

---

1. For example, according to his attorney, Zfaty's applicable offense level for the Federal Sentencing Guidelines is 12, relatively low on the guidelines scale of 1 to 43.